## BROCO EXCERPTS OF RICKEY WALKER'S DEPOSITION

| START | FINISH |
|---|---|
| Page 5, line 7 | Page 5, line 13 |
| Page 5, line 17 | Page 12, line 22 |
| Page 13, line 7 | Page 15, line 11 |
| Page 15, line 21 | Page 18, line 16 |
| Page 18, line 20 | Page 21, line 15 |
| Page 21, line 19 | Page 22, line 12 |
| Page 29, line 8 | Page 29, line 15 |

ROSENBAUM vs
CAL DIVE
RICKEY D. WALKER
JANUARY 20, 2006
Reported By:
KATHY MARTINY, CCR

Case 2:04-cv-03274-HGB-SS   Document 168   Filed 02/03/06   Page 2 of 10

Page 1

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANTHONY ROSENBAUM | * | CIVIL ACTION |
|     Plaintiff | * | |
| | * | NO. 04-3274 |
| VERSUS | * | |
| | * | SECTION "C" |
| CAL DIVE INTERNATIONAL, INC. | * | |
|     Defendant and | * | MAG. (01) |
|   Third Party Plaintiff | * | |
| | * | JUDGE BERRIGAN |
| VERSUS | * | |
| | * | MAGISTRATE SHUSHAN |
| BROCO, INC. | * | |
|   Third Party Defendant | * | |
| *    *    *    *    * | * | |

     Deposition, via telephone, of RICKEY D. WALKER, taken in the above-entitled cause by Kathy A. Martiny, a Certified Shorthand Reporter, authorized to administer oaths of witnesses, pursuant to Section 961.1 of Title 13 of the Louisiana Revised Statutes of 1950, as amended, pursuant to the following stipulation on Friday, the 20th day of January, 2006, given at the offices of SPYRIDON, KOCH, PALERMO & DORNAN, 3838 North Causeway Boulevard, Suite 3010 Lakeway III, Metairie, Louisiana, 70002.

ROSENBAUM vs
CAL DIVE

RICKEY D. WALKER
JANUARY 20, 2006

Reported By:
KATHY MARTINY, CCR

### Page 2

```
 1  APPEARANCES:
 2
 3  REPRESENTING CAL DIVE INTERNATIONAL, INC.:
 4       BAYNHAM, BEST, L.L.C.
         Attorneys at Law
 5       (BY:  T. PATRICK BAYNHAM, ESQUIRE)
         3850 North Causeway Boulevard
 6       Suite 950 Lakeway Two
         Metairie, Louisiana    70002
 7       (504) 837-3878
 8
 9  REPRESENTING BROCO, INC.:
10       SPYRIDON, KOCH, PALERMO & DORNAN
         Attorneys at Law
11       (BY:  PAUL D. PALERMO, ESQUIRE)
         3838 North Causeway Boulevard
12       Suite 3010 Lakeway Three
         Metairie, Louisiana    70002
13       (504) 830-7800
14
15  ALSO PRESENT:
16
17       Reported by KATHY A. MARTINY, Certified
18  Shorthand Reporter in and for the State of
19  Louisiana.
20
21
22
23
24
25
```

### Page 4

```
 1  EXAMINATIONS:
 2
 3  EXAMINATION BY MR. PALERMO:  Page 5, Line 6; Page
 4  29, Line 7
 5  EXAMINATION BY MR. BAYNHAM:  Page 22, Line 13
 6
 7  DEPOSITION EXHIBIT LIST:
 8       NONE
 9
10
11
12
13       (Please note that throughout this
    transcript when the word "uh-huh" appears it is
14  meant to denote and affirmative response; when the
    word "unh-unh" appears, it is meant to denote a
15  negative response).
```

### Page 3

```
 1           S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and
 4  between counsel for the parties hereto that the
 5  deposition of the aforementioned witness is hereby
 6  being taken under the Louisiana Code of Civil
 7  Procedure, Article 1421, et seq., for all purposes,
 8  in accordance with law;
 9       That the formalities of reading, signing,
10  sealing, certification, and filing are specifically
11  waived;
12       That all objections, save those as to the
13  form of the question and the responsiveness of the
14  answer, are hereby reserved until such time as this
15  deposition, or any part thereof, may be used or
16  sought to be used in evidence.
17
18
19       KATHY A. MARTINY, Certified Court
20  Reporter, in and for the Parish of Orleans, State
21  of Louisiana, officiated in administering the oath
22  to the witness.
```

### Page 5

```
 1                 [REDACTED]
 2
 3
 4
 5
 6  EXAMINATION BY MR. PALERMO:
 7     Q.  Good morning, Mr. Walker.  My name
 8  is Paul Palermo; and we're here to take your
 9  perpetuation deposition for the trial in this
10  matter, which is set for Monday, January 30th.
11  Could you please give us your full name and address
12  for the record?
13     A.  My name is Rickey Dean Walker; Rickey is
14  R-I-C-K-E-Y; Dean is D-E-A-N; Walker, W-A-L-K-E-R.
15  My address is 1701 Old Livingston Highway,
16  Woodville, Texas, 75979.
17     Q.  Okay.  Would you please give us your
18  educational background?
19     A.  Primarily, really, it's -- what do
20  you call it?  Occupational training, whatever,
21  although I did have one semester of college back
22  in 1972/'73; but getting out of of the Navy in late
23  '72 I went to dive school a third time, two times
24  in the Navy; but I went to Commercial Dive Center
25  in spring of '73 in Willington, California; that
```

2 (Pages 2 to 5)

601 Poydras Street, Suite 2003         GAUDET KAISER, L.L.C.          Telephone: (504) 525-9100
New Orleans, LA 70130-6044         Board-Certified Court Reporters    Facsimile: (504) 525-9109

Page 6

1  was about a four, five month course, four-month, I
2  believe.
3          And then I went to work in the
4  Gulf of Mexico; and everything since then, as
5  far as training goes, has been either on the job,
6  apprenticeship as in a tender for diving, and
7  various courses that I take from time to time
8  that are directly related to my work.
9      Q.  Okay.  How much of your experience did
10 you have following dive school as a diver?
11     A.  Um, starting in spring of -- actually, May
12 of 1973 until the end of 1979, literally the end of
13 the year, I was actively engaged in diving and, you
14 know, diving supervision.
15     Q.  Okay.
16     A.  And again, in -- and I'm not -- I've got
17 my resume' in front of me; let me see if I can pick
18 a date up here.  About 1987 and '88 I worked for
19 two companies; I went back to diving; I was working
20 for a company in Pasadena, Texas called Offshore
21 Diving and Salvaging as a supervisor on inspection-
22 oriented work.
23          And I later went to a construction job
24 in 1988, working for Triton Marine Construction; I
25 believe it was on a railroad tressel repair in

Page 7

1  Maryland.  And that would be pretty much the extent
2  of my construction diving experience.
3      Q.  Okay.  Can you take us after 1979?  What
4  did you do?
5      A.  I took an opportunity to jump into
6  consulting.  I went to work for Brunei Shell
7  Petroleum Consulting Company, a company that was
8  working for Brunei Shell Petroleum; and during that
9  4-year period of time there we were representing
10 Brunei Shell Petroleum, the oil company; and
11 managing the diving operations that were being
12 conducted on their behalf.
13     Q.  Okay.  After working as a consultant for
14 Brunei Shell, what did you do?
15     A.  Came back to the U.S.; worked with
16 a company doing onshore -- cleaning up after
17 onshore drilling operations.  The oil industry
18 was in a bit of a slump then, and I took an
19 opportunity to take a break from diving and subsea
20 operations, and worked on shore for a few years
21 with Vortex Services; these are in my resume'.
22 Vortex Services and Unislip; I was doing training
23 operations and such for nuclear power plants for
24 the use of portable machine tools and things like
25 that.

Page 8

1      Q.  Okay.
2      A.  And that's when that took me into about
3  1987, when I went back to diving for a couple --
4  well, for about a year.
5      Q.  Okay.  What did you do in the period
6  beginning in 1987?
7      A.  '87/'88 was when I was working for
8  Offshore Diving and Salvaging as a supervisor, '88
9  was as a diver; I rolled over to diving in Maryland
10 on a construction project; and then subsequent to
11 that I went back to work for a consulting firm
12 called West Solutions out of Lafayette, Louisiana;
13 and have been consulting on behalf of the oil
14 companies ever since.  And that's more along the
15 lines of a project management perspective; again,
16 representing the interests of the oil companies in
17 diving and subsea-related operations.
18     Q.  During your experience as a diver, did you
19 have an opportunity to burn with a cutting torch?
20     A.  Yes.  I did.  Although, my burning is
21 primarily -- was primarily back in the 70s, and
22 again in '88, was done with steel rods, tough coat
23 rods, or whatever, not the BROCO rod.
24          However, in 1981, or '80 and '81,
25 probably while I was working for Brunei Shell

Page 9

1  Petroleum, I was running occasional training
2  courses for the divers to educate them in the use
3  of the BROCO rod; and I actually demonstrated the
4  rods on the surface, cutting pipe; and then looked
5  over everyone's shoulder as they got that
6  experience before I put them in the tank to utilize
7  the rod in the water.
8      Q.  Okay.  In the areas of diving operations
9  and diving safety, have you been tendered as an
10 expert and accepted as an expert in court before?
11     A.  Yes.  I have.  And that's why, when
12 you contacted me in June last year, that was my
13 understanding of what you needed from me was to
14 review some documents that you eventually provided;
15 and to offer an opinion as related -- in this
16 matter, as relates to diving safety and diving
17 operations.
18     Q.  Which courts have you been tendered as an
19 expert in diving safety and diving operations in?
20     A.  Quite a bit in -- and I may get some
21 of this -- I don't recall the exact title; but
22 Jefferson Parish, or maybe it was East Jefferson,
23 I'm not sure which; I've been in -- I actually
24 testified in court in Franklin, which I guess would
25 be St. Mary.

3 (Pages 6 to 9)

### Page 10

1   And I've testified as early as 1991
2   in a Texas court, Matagorda County, I believe it
3   was; and in a New Orleans court as recently as -- I
4   don't have that list in front of me; but on my list
5   of experience it's Compton versus Torch; I was
6   working for Robert Reich on behalf of Torch,
7   Incorporated.
8      Q.  Okay.
9      MR. PALERMO:
10         At this time we'll go ahead and tender
11  Mr. Walker as an expert in diving safety and diving
12  operations.
13     MR. BAYNHAM:
14         We'll accept him.
15     Q.  (BY MR. PALERMO).  Mr. Walker, can
16  you give us a summary of the documents which
17  you reviewed in connection with this lawsuit?
18     A.  Let's see.  I've got my record in front
19  of me, and I'll go from that so it will help me to
20  avoid omitting something.  But I've reviewed, oh,
21  five, six -- six depositions:  Mr. Rosenbaum; Gary
22  Maines, I believe that's BROCO; Benjamin McCall;
23  James Proskovec; Don Crawford; and Daniel Schultz.
24  I've also -- and there were numerous attachments to
25  those.

### Page 11

1          I've been -- I've reviewed Cal Dive
2   International's operations manual; that would be
3   their diving safety manual; their EHS manual; I'm
4   familiar with -- oh, they have about a half dozen
5   manuals in their library considered their
6   operations manual.
7          The Association of Diving Contractors
8   "Consensus Standards;" U.S. Coast Guard "Commercial
9   Diving Regulations", that's 46 CFR 197; OSHA
10  "Commercial Diving Standards", that would be 29 CFR
11  1910; I believe it's -- yeah.  It's 401-441.  The
12  U.S. Navy diving manual, I used Rev 4; and there's
13  a small manual that the Navy provides called
14  Underwater Cutting and Welding Manual; I've got
15  that in my library.
16         The International Marine Contractors
17  Association guidance notes; a book written by -- or
18  a booklet, I guess -- written by John Roat, a Cal
19  Dive employee, that's called "Underwater Oxy-Arc
20  Cutting"; I've reviewed the BROCO Manual for the
21  underwater BR-22 torch burning system.
22         I also looked at an expert report
23  from Mr. Eric C. Jackson, which I relied on for
24  his opinion in how the arcing actually occurred;
25  and a report, although I didn't rely on it in great

### Page 12

1   detail, but a report entitled:  "Investigations
2   into the Damage Caused to a Diver's Helmet by an
3   Explosion During Oxy-Arc Cutting Operations in the
4   North Sea"; that was from the Health and Safety
5   Executive in the North Sea.  And those are
6   documents I have listed on my report.
7      Q.  Okay.  Based on your review of documents,
8   can you tell me what is your understanding of what
9   happened in this matter?
10     A.  Well, in a nutshell, Mr. Rosenbaum was
11  making a dive to 200, I want to say 243 feet of
12  water to utilize a BROCO torch to cut lifting eyes
13  in the top of some -- the stubs of some jacket
14  legs; and during that exercise I understand he
15  burned about twelve rods, and then put the 13th rod
16  in; and when he initiated that burn there was
17  apparently an explosion in which he injured his
18  hand.
19     Q.  Okay.  In connection with this matter,
20  is the focus of your testimony on the actions and
21  inactions of Cal Dive and BROCO?
22     A.  Absolutely.  I -- again, I rely on
23  ████████████ --
24  ████████████
25  ████████████████████████████

### Page 13

1   ████████ arcing occurred --
2   ████████
3   ████████████████████ that caused the
4   ████████████████████████████ led
5   to that are the object of my opinion.
6   ████████████████████████████
7   ████████████.  But is the subject of
8   your testimony related to the actions and inactions
9   of Cal Dive and Mr. Rosenbaum?
10     A.  Absolutely.  Their actions in regard
11  to -- and I'll deal -- express those in some
12  detail; but things that they did in this matter;
13  and their inactions, obviously, in areas that they
14  did not cover the bases.
15     Q.  Okay.  With respect to the actions or
16  inactions of Cal Dive, can you give us your opinion
17  as to those, please?
18     A.  Well, in a nutshell, it boils down
19  to a lack of proper training of their personnel
20  and the use of the BROCO torch; a lack of planning
21  for the setup and use of the torch; and then the
22  failure to forward information to the divers in
23  safety meetings and such regarding known concerns
24  about problems with the torch.
25     Q.  Can you explain to the jury your opinion

4 (Pages 10 to 13)

601 Poydras Street, Suite 2003     GAUDET KAISER, L.L.C.          Telephone: (504) 525-9100
New Orleans, LA 70130-6044     Board-Certified Court Reporters     Facsimile: (504) 525-9109

Page 14

1 about the lack of proper training by Cal Dive?
2    A.  Well, I have seen no evidence to
3 suggest that there was training classes; the divers
4 themselves, or diving person themselves expressed
5 that they were unfamiliar with the proper setup of
6 the torch.
7          I don't recall anyone being able
8 to properly calculate the pressures required for
9 oxygen supply to the torch, or the proper amperage
10 settings for the torch in the depth of water that
11 it was being used; they used the ground improperly,
12 using a water -- an inwater ground instead of
13 actually attaching the ground to the work.
14          All the gentlemen who gave testimony
15 were totally unfamiliar with the proper use of the
16 equipment; and I believe Mr. Schultz made reference
17 to -- he's a safety man for Cal Dive -- made
18 reference to the fact that there's a safety --
19 there's a brochure included in every box of rods
20 that gives details on the proper use of the
21 equipment.
22          And it was apparently an
23 assumption on his part and that of others that
24 this was readily available to the personnel, and
25 that they were familiar with it; but it was obvious

Page 15

1 that they weren't.
2    Q.  In this case, Mr. Proskovec testified that
3 in three instances there could be a source of a
4 fire at the collet, one being the diver burning the
5 rod too short; two being the washer being ruptured
6 or torn; and three being the collet being loose --
7 the collet nut being loose and not sufficiently
8 tightened.  Did you find any evidence to suggest
9 that any of those concerns of Mr. Proskovec were
10 ever communicated in training class to the Cal Dive
11 divers.
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20    Q.  (BY MR. PALERMO).  Go on.
21    A.  Okay.  It is my understanding that from
22 all the information I've reviewed that none of that
23 was covered in any -- there's no evidence that it
24 was addressed in a JSA; none of the people who
25 testified in depositions made any reference to any

Page 16

1 cautions that they were given, in spite of the fact
2 that Mr. Proskovec had some awareness, no matter
3 what his source, of these problems.
4          And that's where I came to the
5 conclusion that that's -- it's a breach of the
6 trust of the the standard of care that's expected
7 of the diving supervisor; in fact, it's mandated by
8 the Coast Guard that the supervisor properly brief
9 his personnel, and that he's responsible for the
10 safety and health of those personnel; and if he had
11 concerns, even if they were hearsay, he should have
12 raised those concerns; and, in fact, he should have
13 mitigated them by use of a JSA, which is required
14 in the Cal Dive manual.
15    Q.  Okay.  Let's go on.  You had mentioned
16 also that one of your areas of concern was that of
17 Cal Dive's planning and assessment that they were
18 supposed to do.  Can you explain what you mean by
19 that, please?
20    A.  Well, the Coast Guard requires
21 planning; and the Coast Guard regulations were
22 written so long ago that the industry has developed
23 a system for planning and assessment of all their
24 operations; and in the past 15 years probably it's
25 been the JSA, or job safety analysis; it's also

Page 17

1 called a JHA, a job hazard analysis; and in general
2 terms it's known as a risk assessment.
3          And in that document and the form
4 provided in the concensus standards, in fact, I
5 believe it may even be, if I recall correctly, in
6 the Cal Dive Operations Manual, but with that form,
7 the JSA form, you list the steps that are going to
8 be taken to accomplish the task; and then you list
9 with each of those steps any hazards or concerns
10 that exist in regard to safety.
11          And then the next step is to
12 mitigate those concerns so that they are either
13 eliminated or an alternative method is used to
14 accomplish the work.  And that process was
15 apparently not addressed adequately here, because
16 there's no mention of any of these concerns or
17 mitigating actions to eliminate the risk.
18    Q.  Included within the JSAs would be an
19 assessment of the diving equipment?
20    A.  Yes.  Diving equipment; and how do I put
21 it?  You know, it's just a process that requires
22 evaluation of the safety and health aspects of all
23 equipment and procedures.
24    Q.  Okay.  In your review of the material,
25 did you find any discussion in the JSAs that Cal

5 (Pages 14 to 17)

601 Poydras Street, Suite 2003            GAUDET KAISER, L.L.C.            Telephone: (504) 525-9100
New Orleans, LA  70130-6044           Board-Certified Court Reporters        Facsimile: (504) 525-9109

Case 2:04-cv-03274-HGB-SS   Document 168   Filed 02/03/06   Page 7 of 10

ROSENBAUM vs<br>
CAL DIVE

RICKEY D. WALKER<br>
JANUARY 20, 2006

Reported By:<br>
KATHY MARTINY, CCR

Page 18

1  Dive in any way assessed the effects of operating
2  in an excess psi and excess amps or without
3  grounding to the work site?
4      A.  There's no reference whatsoever in any
5  documentation that I observed.
6      Q.  Okay.  Should Cal Dive have done that in
7  their JSA?
8      A.  Yes.  It's required in their operations
9  manual; I believe it's in section 4; I can't quote
10 them right off the top of my head.  I believe it's
11 4.2, 4.6 and 4.7, if I remember from looking back
12 in the manual for this opinion.
13     Q.  Okay.  Do you have an opinion as to
14 whether the actions of Cal Dive, in terms of
15 planning an assessment and performing the JSAs,
16 breached the standard of care?
17     [redacted]
18     [redacted]
19     [redacted]
20     Q.  (BY MR. PALERMO).  Okay.
21     A.  That was my point; I think I stated
22 that already.  It is a breach of the standard
23 of care for Cal Dive and their representative
24 offshore, who was Mr. Garza or Mr. Proskovec --
25 Mr. Garza being the supervisor; Mr. Proskovec being

Page 19

1  the superintendant on the job -- to fail to discuss
2  the actions required to operate this equipment
3  properly.
4          And there was no instruction at
5  all given to Mr. Caldwell, I believe, whatever
6  the tender's name was that was setting up the
7  gear.  He was basically just told the water depth
8  that they were in; and the assumption was made that
9  he would know how to properly set pressure and
10 amperage.  And that was clearly not the case; they
11 failed in that part to relay that information.
12     Q.  In the diving operations that you
13 supervise presently, do you expect the diving
14 supervisors to cover, in their JSAs, the diving
15 supervisors and diving superintendents to cover
16 when they perform actions or deviate from what
17 manuals require to cover those topics at a JSA?
18     A.  Well, that's part of our process.  And
19 I want to emphasize that a JSA is not prepared by
20 one person; it is a group effort.  It may be
21 initiated -- the form may be -- you know, like the
22 tasks may be listed on the JSA; and then you sit
23 down with a group of people on several levels; and
24 there's actually a level 1, 2, and 3 that I'm aware
25 of.

Page 20

1      One is management level before the
2  job is ever mobilized; and it goes all the way to
3  the day that the work is done, when the personnel
4  sit down and go through those steps.  And that's
5  the way the process is done.
6      Q.  Okay.
7      A.  Or should be done.
8      Q.  And did you find that process to be
9  followed in this case by Cal Dive?
10     A.  I see no evidence at all that there
11 was a JSA created or evaluated in the planning and
12 preparation of the work which we're discussing
13 here.
14     Q.  Okay.  Let me ask you a question now
15 about Mr. Rosenbaum.  Do you understand from this
16 that, do you recall if Mr. Rosenbaum had reviewed,
17 prior to this incident, the BROCO manual?
18     A.  It's my recollection that his testimony
19 was that he had not.
20     Q.  As a diver, should he review the manual of
21 the torch that he's operating?
22     A.  Yes.  He should.  It's his
23 responsibility that he's familiar with the
24 equipment that he's going to work with.  And it
25 goes beyond that, because he can't instruct anyone

Page 21

1  else in the proper use of that equipment unless he
2  himself knows how to use it.
3      Q.  Is it his responsibility to tighten the
4  collet nut on after he replaces the rod?
5      A.  One of the last things he does when
6  he gets ready to burn is stick that rod in the
7  torch and tighten the nut securely, the collet
8  nut securely, to hold that rod in place and make
9  sure there's a good connection between the torch
10 and the rod.  And the evidence -- or the theory
11 of Mr. Jackson is supported by that lack of action.
12     Q.  And do you have an opinion as to whether
13 the failures of Cal Dive and Rosenbaum more
14 probably than not relate to the failure to tighten
15 the collet nut in this case?
16     [redacted]
17     [redacted]
18     [redacted]
19     Q.  (BY MR. PALERMO).  Okay.
20     A.  That's what my opinion is.  Again, I'm
21 relying on the cause of, as stated or theorized by
22 Mr. Jackson.  But that being the case, there is an
23 indication that the torch was not tightened
24 properly -- the nut was not properly tightened on
25 the torch.

6 (Pages 18 to 21)

601 Poydras Street, Suite 2003<br>
New Orleans, LA 70130-6044

GAUDET KAISER, L.L.C.<br>
Board-Certified Court Reporters

Telephone: (504) 525-9100<br>
Facsimile: (504) 525-9109

Page 22

1  Q. In this case, you've not been asked to,
2  and you're not offering an opinion as to the cause
3  and origin of the fire, but as to the actions and
4  inactions of Cal Dive and Mr. Rosenbaum in the
5  events leading up to the fire; is that correct?
6  A. That is correct. Again, I rely on
7  Mr. Jackson's hypothesis or theories on that,
8  and tried to find, in my review, the cause; and
9  it relates to the actions and inactions of Cal Dive
10 in this part.
11     MR. PALERMO:
12          Okay. Thank you. I'm finished.
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 Q. Fine. How are you? I don't have many
18 questions; I just want to ask you a few. Just to
19 clarify, you're not being offered as an expert to
20 offer an opinion on the cause of the explosion;
21 isn't that right?
22 [redacted]
23 [redacted]
24     WITNESS:
25          That's -- I mean, I rely on

Page 23

1  Mr. Jackson's theory for the actual initiation
2  cause.
3  Q. (BY MR. BAYNHAM). Okay. And you've
4  never actually used a BROCO 22 torch underwater
5  cutting like Mr. Rosenbaum was doing at the time
6  of the accident?
7  A. I don't -- I don't recall specifically.
8  If I did, it's been too long; and it would have
9  been in the early 80s when I got in a tank in
10 Brunei.
11 Q. Okay. And in this case you've never
12 actually looked at the remnants of the exploded
13 torch?
14 A. I have only looked at photographs of the
15 exploded torch.
16 Q. And I take it, obviously, you never talked
17 to Mr. Rosenbaum or Mr. Proskovec?
18 A. I have never spoken with either of the two
19 gentlemen.
20 Q. Or anybody at Cal Dive about the accident?
21 A. No. I have not.
22 Q. Okay. And never did a vessel inspection
23 in this case?
24 A. Nope. I did not.
25 Q. Now, you're not giving opinions today --

Page 24

1  you've already said you're not giving an opinion as
2  to the cause of the ignition; is that right?
3  A. That's correct.
4  Q. And you're not giving any opinions
5  on whether or not there was a design defect
6  or a manufacturing defect in the BROCO 22 torch?
7  A. No. I'm leaving that to the engineers.
8  Q. Okay. Now, you say that Mr. Rosenbaum
9  wasn't properly trained?
10 A. He himself expressed -- made the comments
11 in his deposition that he did not know how to
12 calculate the pressures or amperage on the torch;
13 and that's an indication that he was not properly
14 trained, to me.
15 Q. All right. But the fact that he
16 didn't know how to calculate the amperage or
17 the psi you're not saying caused or contributed
18 to the ignition of his torch; are you?
19 A. No. I'm using that as a reference to his
20 lack of training only.
21 Q. All right. And can you tell me -- I
22 don't think Mr. Rosenbaum was asked specifically
23 in his deposition what specific training he had in
24 using the BROCO 22 torch. Do you have any
25 information on what training he had?

Page 25

1  A. I do not. No.
2  Q. All right. So if Mr. Rosenbaum were to
3  testify at trial that he was actually trained in
4  how to set up amps and psi, and he knew to tighten
5  the collet nut on the BROCO 22 torch, you wouldn't
6  have any information to counter that; would you?
7  [redacted]
8  [redacted]
9  Q. (BY MR. BAYNHAM). Okay.
10 A. No. My only information is based
11 on his current -- or current at the time of
12 the accident knowledge of how to operate the
13 torch, or a lack thereof.
14 Q. Okay. I guess what I'm saying is if
15 a question wasn't asked in his deposition about
16 training, then you don't know about that? In
17 other words, if he wasn't asked to list what
18 training he had, and you haven't been given that
19 information about what training he had, so you're
20 having to assume that he wasn't trained?
21 A. That is proper -- that is correct; and
22 any supervisor should evaluate that, in my opinion,
23 on a regular basis, and make sure they know the
24 knowledge levels of their personnel.
25 Q. Okay. And as I recall in Mr. Proskovec's

7 (Pages 22 to 25)

601 Poydras Street, Suite 2003　　　GAUDET KAISER, L.L.C.　　　Telephone: (504) 525-9100
New Orleans, LA 70130-6044　　　Board-Certified Court Reporters　　Facsimile: (504) 525-9109

**Page 26**

1  deposition, he wasn't asked what it is he trained
2  his people to do as far as the use of the BROCO 22
3  torch, or what he told his crew before the dive, or
4  anything like that.  So do you remember in his
5  deposition him being asked that?
6     A.  I do not.  No.  I'm only going by
7  what was not visible in JSAs and whatever as far as
8  physical evidence of that; and their testimony that
9  they -- of what they discussed and what was told to
10 the tenders as far as setting up the gear and
11 everything.
12    Q.  All right.  So you've talked about the
13 lack of training and the lack of planning; and you
14 mentioned improper grounding; but you're not -- you
15 can't, from an expert's standpoint as an expert in
16 diving safety, you're not able to say that these
17 three things -- training, planning, and improper
18 grounding -- caused or contributed to the ignition
19 of the torch; is that right?
20    [redacted]:
21    [redacted]
22    Q.  (BY MR. BAYNHAM).  Okay.
23    A.  Well, I can -- I can testify that had
24 those things been followed, we would certainly have
25 eliminated at least one of these problems; that

**Page 27**

1  would be the grounding, because there's no written
2  documentation anywhere that suggests that this is
3  an approved method by any standard.  And the other
4  items should have been -- if they were discussed in
5  more detail, we might have had the torch set up
6  properly, and eliminated some of these other
7  concerns.
8     Q.  Right.  But you're not saying that any of
9  these concerns caused the ignition of the torch?
10    A.  Oh, no.  That's not in the area of my
11 opinion.
12    [redacted]
13    [redacted]
14    Q.  (BY MR. BAYNHAM).  I don't know if you
15 have been given Mr. Jackson's deposition, and
16 you've stated that you relied on his testimony.
17 But in his deposition he states that the grounding
18 of the torch had nothing to do with the accident.
19    A.  It's just I believe -- and I did not
20 review his deposition; I only read his report; and
21 you are correct in your statement.  I refer to the
22 grounding in this case, as I did in my report, that
23 I believe Mr. Rosenbaum was a victim of electric
24 shock at some point during this, either the
25 beginning or during when his injury occurred.

**Page 28**

1     Q.  Okay.  And finally you state that you
2  agree with Mr. Jackson that Mr. Rosenbaum didn't
3  properly tighten the collet nut.  Mr. Rosenbaum
4  says he did properly tighten the collet nut.
5     A.  Well, I mean, he says that; but I have
6  to go on the evidence that I've reviewed; and I get
7  an indication that something was wrong there; and
8  that's the best case scenario from my opinion.
9     Q.  Okay.  And again, you're relying on
10 Mr. Jackson's analysis of that?
11    A.  Yes.  I am.  Along with the fact of
12 Mr. Rosenbaum and the others who were deposed
13 expressed unfamiliarity with the torch and the
14 process.
15    Q.  But you would agree that Mr. Rosenbaum
16 was never asked in his deposition about whether
17 he tightened the collet nut or knew to tighten
18 the collet nut.  You don't remember that in his
19 deposition; do you?
20    A.  I do not remember it specifically in his
21 deposition.
22    Q.  All right.  You're saying that he was
23 unfamiliar with other things; therefore, he must
24 have been unfamiliar with tightening the collet
25 nut?

**Page 29**

1     A.  That is correct.
2  [redacted]:
3  [redacted]
4  [redacted]:
5  [redacted]
6  [redacted]
7  EXAMINATION BY MR. PALERMO:
8     Q.  Is it your opinion that the failures of
9  Cal Dive and Mr. Rosenbaum were causal factors that
10 led to the failure to tighten the collet nut?
11    A.  Yes.  I believe they set up the
12 circumstances by which Mr. Jackson's theory
13 of the cause of the explosion occurred.
14    MR. PALERMO:
15       That's it.  Thank you.
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20
21
22    (Whereupon, the deposition was
23 concluded.)
24
25

8 (Pages 26 to 29)

601 Poydras Street, Suite 2003
New Orleans, LA 70130-6044
GAUDET KAISER, L.L.C.
Board-Certified Court Reporters
Telephone: (504) 525-9100
Facsimile: (504) 525-9109

Page 30

1     REPORTER'S CERTIFICATE
2         I, Kathy A. Martiny, Certified Shorthand
3  Reporter in and for the State of Louisiana, do
4  hereby certify that the foregoing deposition of
5  RICKEY DEAN WALKER was taken before me at the time
6  and place hereinabove mentioned, and that said
7  witness was first duly sworn to tell the truth, the
8  whole truth and nothing but the truth in answer to
9  the questions as propounded; said deposition
10 further being taken by me in computer shorthand and
11 thereafter transcribed under my supervision; that
12 the foregoing pages contain a true and correct
13 transcription of said testimony, to the best of my
14 ability and understanding.
15         I further certify that I am not of
16 counsel, nor related to any of the parties to this
17 cause, nor in the employ of any of them; and that I
18 am in no way interested in the result of said
19 cause.
20
21         ---------------------------
22         KATHY A. MARTINY
23         Certified Shorthand Reporter
24
25

9 (Page 30)

601 Poydras Street, Suite 2003      GAUDET KAISER, L.L.C.          Telephone: (504) 525-9100
New Orleans, LA 70130-6044       Board-Certified Court Reporters   Facsimile: (504) 525-9109